AO108(2/90) Application for Seizure Warrant

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

In the Matter of the Seizure of
(Address or brief description of property or premises to be seized)

**Funds in the Amount of Twenty-eight Thousand Dollars ($28,000.00) on deposit in Union Bank of California in account number xxxxxx3264**

## APPLICATION AND AFFIDAVIT FOR SEIZURE WARRANT

CASE NUMBER:

I, _____Steve Francis_____ being duly sworn depose and say:

I am a(n) Special Agent with the United States Department of Homeland Security, Immigration and Customs Enforcement and have reason to believe that within the jurisdiction of this Court there is now certain property that is subject to forfeiture to the United States, namely (describe the property to be seized)

Funds in the Amount of Twenty-eight Thousand Dollars ($28,000.00) on deposit in Union Bank of California in account number xxxxxx3264

which are (state one or more bases for seizure under the United States Code) funds derived from proceeds traceable to a violation of Title 18, United States Code, Section 371 and Title **50, United States Code, Section 1705,** and are therefore subject to forfeiture

concerning a violation of Title __18__ United States Code, Section(s) 981(a)(1)(C). The facts to support a finding of Probable Cause for issuance of a Seizure Warrant are as follows:

SEE ATTACHED AFFIDAVIT HEREIN INCORPORATED BY REFERENCE AS IF FULLY RESTATED HEREIN

Continued on the attached sheet and made a part hereof.    ☒ YES   ☐ NO

William R. Cowden, Chief
Asset Forfeiture Unit, Criminal Division
(202) 307-0258

Signature of Affiant
Steve Francis, Special Agent
United States Department of Homeland Security,
Immigration and Customs Enforcement

Sworn to before me, and subscribed in my presence

_____   at Washington, D.C.
Date

_____   _____
Name and Title of Judicial Officer           Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR A SEIZURE WARRANT

I, Steve Francis, having been duly sworn, state as follows:

1.  I am a Special Agent with the U.S. Department of Homeland Security, Immigration and Customs Enforcement, Chicago Field Division ("ICE"). I have been so employed since December 2002. I previously was employed as a Special Agent with the Department of Health and Human Services, Office of Inspector General, from March 1998 to December 2002. Among my current responsibilities are the investigation of violations of the Export Administration Regulations and the International Emergency Economic Powers Act.

2.  I have attended the Basic Criminal Investigator Training Program at the Federal Law Enforcement Training Center. I have also attended the Customs Basic Enforcement Service and Undercover Operative Training Course. I am a certified undercover agent with ICE. My training and experience have provided me with an understanding of United States export control laws involving national security and foreign policy.

3.  I submit this affidavit in support of a seizure warrant for all funds up to the amount of $28,000.00 in Union Bank of California Account No. xxxxxx3264. As discussed below, the funds in this bank account, up to the amount of $28,000.00, are subject to seizure and forfeiture pursuant to 18 U.S.C. §§ 981(d)) and 981(a)(1)(C), as personal property derived from proceeds traceable to a violation of 18 U.S.C. § 371, conspiring to violate the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1705 (a specified unlawful activity), and the Iranian Transactions Regulations ("ITR"), 31 C.F.R. Part 560. In summary, there is probable cause to believe that these funds are the proceeds of a conspiracy to export and attempt to export goods – namely, Shinyong KDK textile machines (hereinafter KDK textile machines), from the United States to Iran.

4.      This affidavit is based on my own investigation, and my review of e-mails, recorded conversations and other records, as well as, information that I have learned through communications with other law enforcement personnel.  Further, as detailed below, this investigation involves the use of a law enforcement officer in an undercover capacity.

5.      Because this affidavit is being submitted for the limited purpose of setting forth probable cause, I have not included each and every fact known to me concerning this investigation.  I have set forth only those facts that I believe are sufficient to establish probable cause as to the funds and other things of value in the Union Bank of California account identified above.

A.      **The Statutory and Regulatory Framework Underlying the Iranian Embargo**

International Emergency Economic Powers Act

6.      The International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1705, authorizes the President of the United States to impose economic sanctions against a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy, or economy of the United States when the President declares a national emergency with respect to that threat.  It is a criminal offense to willfully violate any license, order, or regulation issued under this statute.

7.      On March 15, 1995, the President issued Executive Order No. 12957 finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States" and declaring "a national emergency to deal with that threat."  Executive Order No. 12957, as expanded and continued by Executive Orders No. 12959 and 13059 and successive Presidential Notices, was in

effect at all times relevant to the events underlying the charges herein.

8. Executive Orders No. 12959 and 13059 (the "Executive Orders") impose economic sanctions, including a trade embargo, on Iran. The Executive Orders prohibit, among other things, the exportation, re-exportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person. The Executive Orders also prohibit any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, any prohibition set forth in the Executive Orders.

The Iranian Transactions Regulations

9. The Executive Orders authorize the Secretary of the Treasury, in consultation with the Secretary of State, "to take such actions, including the promulgation of rules and regulations, as may be necessary to carry out the purposes" of the Executive Orders. Pursuant to this authority, the Secretary of the Treasury promulgated the ITR, implementing the sanctions imposed by the Executive Orders.

10. Under the ITR, 31 C.F.R. Part 560:

a. 31 C.F.R. § 560.204 provides that no goods, technology, or services may be exported, re-exported, sold, or supplied to Iran, directly or indirectly, from the United States or by a United States person wherever located, without authorization; and

b. 31 C.F.R. § 560.203 prohibits any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or that attempts to violate, any of the prohibitions set forth in Part 560. Section 560.203 also prohibits any attempt to violate the prohibitions contained in Part 560. The export or re-export

to Iran of KDK textile machines is subject to the ITR.

11.  The United States Department of the Treasury's Office of Foreign Assets Control ("OFAC"), located in the District of Columbia, has responsibility for administering the ITR and is the entity empowered to authorize transactions with Iran during the embargo. Such authorization, if granted, would be in the form of a license.

**B.  History of the Investigation and Facts Supporting Probable Cause**

12.  Corporation A, which is located in Illinois and is cooperating with law enforcement, manufactures and sells textile machinery. Corporation A sells this equipment domestically and internationally. Exportation of this type of equipment sold by Corporation A to Iran would require an export license issued by OFAC.

13.  I have learned that, in August 2003, Babak Maleki, as known as Bobby Maleki, doing business as M&M Investment Co. (M&M), located in Beverly Hills, California and Spartanburg, South Carolina, approached Corporation A about the purchase of textile machinery that, according to Bobby Maleki, was destined for Iran. I have learned that Dun & Bradstreet lists M&M's principal location as 260 South Beverly Drive, Beverly Hills, California, 90212. Dun & Bradstreet lists Mojtada Maleki, also known as Moji Maleki, as the "Manager" of the business. I have learned that Moji Maleki is Bobby Maleki's father. The Dun and Bradstreet report lists Babakk Maleki as the President of a second business at the same address.

14.  Documents provided by Corporation A reveal that, on September 17, 2003, Bobby Maleki sent Corporation A a purchase order with invoice number 10602 for textile machinery. The purchase order with invoice number 10602 was provided by M&M and arrived via the e-mail account MMINVST@aol.com. Bobby Maleki electronically signed the purchase

order.

15. On November 13, 2003, Bobby Maleki, using the MMINVST@aol.com account, sent Corporation A an e-mail regarding instructions on the purchase of the textile machinery.

16. On December 23, 2003, Bobby Maleki, sent an e-mail to Corporation B, a freight forwarder located in the State of Illinois that is also cooperating with law enforcement officials. Bobby Maleki's e-mail provided instructions to Corporation B and advised it of the contact person at Corporation A for pick up and delivery of the textile machinery tools. Bobby Maleki advised Corporation B that the invoice number for M& M's purchase was 10602.

17. On December 29, 2003, an employee of Corporation B contacted special agents from the Department of Commerce (DOC) in Chicago. The employee reported that M&M and Bobby Maleki were attempting to export textile machinery acquired from Corporation A from the United States to Iran through Dubai, United Arab Emirates ("U.A.E.").

18. In December 2003, during an interview with DOC special agents, an employee of Corporation B advised the agents that he had informed Bobby Maleki that he could not ship the commodities to Iran without the proper licenses. After being notified of the license requirement, Bobby Maleki advised Corporation B to change the ultimate destination of the shipment from Iran to Dubai, U.A.E.

19. On January 5, 2004, an employee of Corporation B, under the direction of DOC special agents, made a consensually monitored phone call to Bobby Maleki regarding the shipment of textile machinery to Iran. Bobby Maleki advised the employee of Corporation B that the goods purchased from Corporation B were destined to the U.A.E., not Iran.

20. In the course of this investigation, I have learned that M&M maintains two bank

accounts with Union Bank of California. The account numbers are xxxxxx3264 and xxxxxx3337. Signature cards for the accounts list Mojtaba Malek-Ghomi and Babak Maleki as authorized signatories for both accounts. Documents provided by Union Bank of California to your affiant reveal that check number 1241, written on account number xxxxxx3264, appears to be signed by Bobby Maleki and is for $28,837.30 payable to the order of Corporation A. The "for" line on the check is hand written and states "final payment for invoice # 10602". Invoice number 10602 from Corporation A is for the textile machinery that Bobby Maleki ordered on behalf of M&M.

21.    In exporting goods overseas, a shipper is required to submit a Shipper's Export Declaration (SED) to the U.S. government, which maintains such forms with the DOC. In a search for SED's submitted by Bobby Maleki or M&M near the time of the aforementioned e-mails, agents found an SED by Bobby Maleki which states that on January 10, 2004, Bobby Maleki was the U.S. principal that caused the shipment with Corporation B. The SED contains the following information:

>  Date of Exportation:   01/15/04
>  U.S. Principal:
>
>  Mr. Bobby Maleki
>  260 So. Beverly Dr. Suite 305
>  Brvrtly Hills, CA 90212 US
>
>  Ultimate Consignee:
>
>  Gulf Eagle Trading Co.
>  810 Alrigga Opp. Of
>  Etisalat Al Maktum St.
>  Dubai, AE
>
>  Port of Export:       O'Hare International Airport

22.     On October 8, 2004, a DOC special agent located in Los Angeles conducted a Project Outreach Presentation at M&M Investment Company located at 260 South Beverly Drive, Suite 305, Beverly Hills, California 90212.  The DOC special agent advised this affiant that he spoke to Bobby Maleki directly and advised him of the Iranian embargo and reiterated that Iran cannot receive U.S. goods, and that U.S. parties cannot do business with Iran without an OFAC license.

23.     In January 2005, Corporation B provided DOC special agents an airway bill that contained information relating to the purchase and shipment of textile machinery from Corporation A to Dubai, U.A.E.  The document contains airway bill number 618 5574 7926 and lists M&M Investment Company, 260 S. Beverly Drive, Suite 305, Beverly Hills, CA 90212 US as the shipper and the consignee at Gulf Eagle Trading Co., 810 Alrigga Opp. Of, Etisalat Al Maktum St., Dubai, AE.  A DOC special agent, posted in the U.A.E., obtained records from officials in Dubai that show that upon receipt of the shipment covered by airway bill 618 5574 7926, Gulf Eagle transshipped the container with the textile machinery to an address in Tehran, Iran.

24.     In January 2005, Corporation C, a freight forwarder in Los Angeles, California, informed OFAC of a recent suspicious telephone inquiry from M&M Investment Co. of Beverly Hills, California.  Corporation C advised ICE special agents that an individual who appeared to be associated with M&M Investment Co. made an inquiry for the shipment of fifty containers of unspecified machinery to Bandar Abbas, Iran.

25.     On March 11, 2005, U.S. Customs and Border Protection (CBP) Inspectors interviewed Moji Maleki as he arrived at the Los Angeles International Airport (LAX) on British

Airways Flight 269. Moji Maleki informed CBP officers that he had visited South Korea, the UAE, and Iran. Moji Maleki said that he had conducted no business activity with or in Iran and that he was very aware of the U.S. sanctions program against Iran. Moji Maleki also acknowledged that the U.S. sanctions program against Iran is common knowledge. Moji Maleki was offered, but declined a copy of an OFAC Iranian sanctions pamphlet. Moji Maleki stated he did not need to read the pamphlet, emphasizing that he knew all about the sanctions program, including the brokering provisions and the date of inception of the program.

C.   **The Undercover Investigation of Bobby Maleki, Moji Maleki and Shawn Nejad**

26.   In June 2005, a reliable confidential informant (CI), using the undercover initials "A.A," and an undercover law enforcement officer, using the undercover initials "S.A.," began undercover efforts to purchase KDK textile machines from M&M and export them to Iran.

27.   On June 22, 2005, A.A. called telephone number (310)384-8800, which was listed on an Internet posting for the sale of KDK textile machines as being associated with M&M and Bobby Maleki. I have learned that Moji Maleki is the subscriber for this number. A.A. left a voicemail message in Farsi and advised that he worked for Medina Trading Company in Chicago and was interested in the KDK machines advertised on the Internet.

28.   On July 12, 2005, Shahram Nejad, also know as Shawn Nejad, called A.A. and advised that he would like to speak to him about the KDK machines. On July 15, 2005, A.A. called Shawn Nejad at (310)780-2002, and A.A. advised Nejad that the KDK machines were for a client in Iran.

29.   On July 19, 2005, A.A. called Shawn Nejad at (310)780-2002, and discussed the price of the KDK machines.

30.     In or around July 25, 2005, A.A, S.A., and Shawn Nejad arranged to meet in Los Angeles to inspect the KDK machines.

31.     On August 4, 2005, A.A. and S.A. inspected the KDK machines in a warehouse located at 4320 West Vanowen, Burbank, California. A.A. and S.A. met an individual who identified himself as "John" and provided A.A. and S.A. with access to inspect the KDK textile machines. After the inspection, S.A. and A.A. viewed a photograph of Shahram Setudeh Nejad, provided by the California Department of Motor Vehicles. They confirmed that Nejad was the person with whom they had met during the inspection.

32.     On August 24, 2005, S.A. made a consensually monitored phone call to Moji Maleki, as part of an undercover effort to purchase KDK textile machines for a client located in Iran. S.A. and Moji Maleki discussed the purchase and shipment of the machinery to Iran.

33.     On September 8, 2005, S.A. received an e-mail from MMINVST@aol.com containing a purchase order for 30 KDK textile machines. The purchase order provided the address of M & M Investment Co., PO Box 3794, Beverly Hills, CA 90212. The purchase order stated that the shipment was destined for Dubai, U.A.E., and listed the "ship to" address as AEC LLC, PO Box 116490, Dubai, U.A.E. The purchase order stated that 30 KDK machines would be shipped to the U.A.E. for a total cost of $28,000.00. The total included $7,000.00 in shipping costs.

34.     On September 14, 2005, S.A. again made a consensually monitored phone call to Moji Maleki, as part of the undercover effort to purchase KDK textile machines for a client located in Iran. S.A. and Moji Maleki discussed the purchase and shipment of the KDK textile machines to Iran. S.A. advised Moji Maleki that he would wire $2,800.00 as a deposit for the

KDK machines into Moji's Maleki's bank account once the details were provided.

35.  On September 19, 2005, S.A. received an e-mail from MMINVST@aol.com. An AOL representative verified that this e-mail account belongs to Moji Maleki. Moji Maleki advised S.A. via e-mail of the following regarding Moju Maleki's bank account:

>   Bank Name:     Union Bank of California
>   Branch:        West Wood Blvd
>   Account Name:  M&M Investment Blvd
>   Account number: #xxxxxx3264
>   Aba:           #122000496

36.  On September 21, 2005, S.A. met with Moji Maleki at 1422 Westwood Boulevard in Los Angeles, California 90024. S.A. and Moji Maleki discussed the export of used textile machines to Iran. S.A. advised Moji Maleki that he/she had wired $2,800.00 into Moji Maleki's bank account. Moji Maleki advised that he would arrange for the shipping of the machines.

37.  On or about October 4, 2005, ICE, through an undercover business, initiated a $2,800.00 wire transfer to the previously identified Union Bank of California business bank account number xxxxxx3264.

38.  On December 5, 2005, at approximately 20:01 hours, Shawn Nejad, using e-mail address: nejads@svn.com, sent an e-mail to S.A. and stated the following:

>   S.A.,
>   Finally, it was loaded and taken by the shipping company as per attached bill.
>   (I had to stay there till 5 PM)
>   Shawn

39.  The document attached to the e-mail was a Straight Bill of Lading – Short Form – Original – Not Negotiable provided by:

>   KARGO TRANSPORTATION INC.
>   1610 Beverly Blvd., #3
>   Los Angeles, CA 90026

>       Tel:   (213) 572-5622
>       Fax:   (213) 572-5632

The Straight Bill of Lading stated that on December 5, 2005, KARGO TRANSPORTATION INC. picked up a forty foot container (Number: OOLU7286892) (Serial Number: A6113171) from M&M INVESTMENTS located at 4851 Alameda Boulevard, Los Angeles, CA and delivered to F-10, Terminal, Long Beach, CA.

40. On December 6, 2005, CBP officers inspected container # OOLU7286892 at the Port of Long Beach, CA, and relayed to your affiant that the commodity appeared to be textile machines. They released the container for export.

41. On or around December 7, 2006, CBP Officer Matos advised your affiant that on December 7, 2005, the container # OOLU7286892 sailed on the Orient Overseas Container Line Limited (OOCL) Rotterdam destined for Dubai, UAE.

42. On or about December 7, 2005, United Cargo Management filed an electronic SED containing the following information: The Principal Party in Interest was listed as M AND M INVESTMENT CO., 260 S Beverly Dr., Beverly Hills, CA 90212. The date of export was 12/07/05. Exporting vessel was OOCL Rotterdam V16. The commodity was 28 electric vacuum cleaners valued at $25,000. The ultimate consignee was M AND M CO., P.O. Box 116490, Dubai, UAE. The booking number was OOLU – LAXDXBC04641.

43. On December 13, 2005, S.A. met Bobby MALEKI at his business office, located at 1220 Maple Avenue Suite 309 Los Angeles, CA 90015. The final payment of $25,200.00 was presented to Bobby MALEKI in the form of a cashier's check. Bobby MALEKI provided S.A. with additional shipping documentation referencing container # OOLU7286892, which he retrieved from an on-site computer. S.A. and Bobby MALEKI also discussed future

transactions.

44.     I have reviewed records obtained from the Union Bank of California pursuant to grand jury subpoenas. Those records reveal that the $2,800.00 wire transfer for the down payment on the purchase of the KDK machinery was posted to Account No. xxxxxx3264 on October 3, 2005. The bank records also show that the cashier's check in the amount of $25,200.00 that S.A. gave to Bobby Maleki on December 13, 2005, was deposited into Account No. xxxxxx3264 on December 16, 2005.

45.     On December 19, 2005, CBP informed the OOCL via letter that container #OOLU7286892 was to be redelivered to the port of Long Beach, CA. CBP advised that it had the authority to seize and detain items and order the return of any suspect shipment.

46.     On January 19, 2006, S.A. met with Moji Maleki at the Coffee Bean located at 1500 Westwood Boulevard, Los Angeles, California 90024. S.A. and Moji Maleki discussed the detention of the container and future transactions. Moji Maleki advised that he did not want to discuss business on the phone and that you had to be careful with this situation.

47.     In January 2006, your affiant received confirmation from OFAC that none of the following individuals/companies had received a license to export or re-export goods to Iran: M & M Investment Company; Moji Maleki; Bobby Maleki or Shawn Nejad.

48.     I am advised that, in pertinent part, 18 U.S.C. 984(b) provides:

> (1) In any forfeiture action in rem in which the subject property is cash [or] funds deposited in an account in a financial institution -
>
>> (A) it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for the forfeiture; and
>>
>> (B) it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property.

>   (2) Except as provided in subsection (b), any identical property found in the same place or account as the property involved in the offense that is the basis for the forfeiture shall be subject to forfeiture under this section.

I am advised that, in essence, Section 984 allows the United States to seize for civil forfeiture identical ("fungible") property found in the same place where the "guilty" property had been kept. See <u>United States v. All Funds Presently on Deposit at American Express Bank</u>, 832 F. Supp. 542, 558 (E.D.N.Y. 1993). I am further advised that the "fungibility" rule of Section 984 cannot reach back in time for an unlimited period. Section 984(b) provides: "No action pursuant to this section to forfeit property not traceable directly to the offense that is the basis for the forfeiture may be commenced more than 1 year from the date of the offense."

49. I am advised that Title 18, United States Code, Section 981(b)(3), provides that "a seizure warrant may be issued . . . by a judicial officer in any district in which a forfeiture action against the property may be filed under Section 1355(b) of Title 28, *and may be executed in any district in which the property is found . . . .*" Inasmuch as an element of all export offenses is the failure to obtain a license and all of the licensing agencies, including OFAC, are in the District of Columbia, the failure to obtain the required license from OFAC described herein occurred in the District of Columbia. See <u>United States v. Montgomery</u>, 441 F. Supp.2d 58 (D. D.C. 2006) (Lamberth, J.) (upholding venue in the District of Columbia in an export violation prosecution, noting, "[V]enue in cases involving a failure to make required filing is typically in the district in which the failure occurred."). Accordingly, this District Court may issue and cause to be served in California or in any other district, the requested seizure warrant.

50. Based on the above facts, there is probable cause to believe that the previously identified bank account, is subject to seizure and forfeiture pursuant to Title 18, United States

Code, § 981(a)(1)(C) as property which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 371, conspiring to violate the International Emergency Economic Powers Act ("IEEPA") and 50 U.S.C. § 1705 (a specified unlawful activity).  I, therefore, respectfully request that a seizure warrant be issued for all funds up to the amount of $28,000.00 in Union Bank of California Account No. xxxxxx3264, 10900 Wilshire Blvd., Suite 101, Los Angeles, California 90024.

                                                                                                               _____
Steve Francis, Special Agent
U.S. Department of Homeland Security
Immigration and Customs Enforcement

SWORN TO AND SUBSCRIBED before me this \_\_\_\_ day of September, 2006.

                                        _____
United States Magistrate Judge
 for the District of Columbia